Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

FILED _____ LODGED
RECEIVED _____ COPY

OCT 1 9 2017

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

District of Arizona

Phoenix Division

Case No. _____

CV-17-3828-PHX-JAT-DMF

*(to be filled in by the Clerk's Office)*

|  |  |
|---|---|
| Cary VanDerMeulen | ) |
| _____ | ) |
| **Plaintiff(s)** | ) |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) |
| *please write "see attached" in the space and attach an additional* | ) |
| *page with the full list of names.)* | ) |
| **-v-** | ) |
|  | ) |
|  | ) |
| Arizona Dept. of Corrections, Charles Ryan - | ) |
| Director, et al. | ) |
| _____ | ) |
| **Defendant(s)** | ) |
| *(Write the full name of each defendant who is being sued. If the* | ) |
| *names of all the defendants cannot fit in the space above, please* | ) |
| *write "see attached" in the space and attach an additional page* | ) |
| *with the full list of names. Do not include addresses here.)* | ) |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### (Prisoner Complaint)

---

#### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Cary VanDerMeulen |
| All other names by which you have been known: | |
| ID Number | 289748 |
| Current Institution | Released |
| Address | 4621 E. Villa Rita Dr. |

| Phoenix | AZ | 85032 |
|---|---|---|
| *City* | *State* | *Zip Code* |

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Charles L. Ryan |
| Job or Title *(if known)* | Director of Arizona Dept. of Corrections |
| Shield Number | |
| Employer | State of Arizona |
| Address | 1601 W. Jefferson |

| Phoenix | Arizona | 85007 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity   ☒ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Deborah Kinder |
| Job or Title *(if known)* | Facility Health Administrator - ASPC Douglas |
| Shield Number | |
| Employer | ADOC / Corizon Health Services |
| Address | C/O  Corizon Health Services |

| | | |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity   ☒ Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3

Name                              Chaplain Herman

Job or Title *(if known)*         Head Chaplain - ASPC Douglas

Shield Number

Employer                          Arizona Dept. of Corrections - ASPC Douglas

Address                           6911 N. BDI Blvd.

| Douglas | Arizona | 85607 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity    ☒ Official capacity

Defendant No. 4

Name                              Captain Paul Martell

Job or Title *(if known)*         Corrections Officer / Disciplinary Officer

Shield Number

Employer                          Arizona Dept. of Corrections - ASPC Douglas

Address                           6911 N. BDI Blvd.

| Douglas | Arizona | 85607 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity    ☒ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Eighth, First, and Fourteenth amendments of the US Constitution

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Defendant #5            Alex Ruiz
                        Coordinator of Food Services
                        Arizona Dept. of Corrections - ASPC Douglas
                        6911 N. BDI Blvd.
                        Douglas, Arizona  85607

                        in both a professionally capacity and individually

Defendant #6            Meegan Muse
                        Warden
                        6911 N. BDI Blvd.
                        Douglas, Arizona  85607

                        in both a professionally capacity and individually

Defendant #7            Corizon Health Services
                        950 W. Elliot Rd. Suite 220
                        Tempe, Arizona  85254

1

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

see attached narrative

## III.   Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

☐   Pretrial detainee

☐   Civilly committed detainee

☐   Immigration detainee

☒   Convicted and sentenced state prisoner

☐   Convicted and sentenced federal prisoner

☒   Other *(explain)*   _Released_

## IV.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.   If the events giving rise to your claim arose outside an institution, describe where and when they arose.

B.   If the events giving rise to your claim arose in an institution, describe where and when they arose.

While in custody of the Arizona Dept. of Corrections during the course of incarceration and continuing for the duration thereof.

_ADOC - Alhambra (Phoenix) & ASPC Douglas_

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

C.    What date and approximate time did the events giving rise to your claim(s) occur?

Between the dates of  3/30/2014 and 10/20/15 - dates for which grievances were filed contain more pertinent information as to the allegations made in this complaint; however, the civil rights violations to which these pertained existed for the duration of confinement.

D.    What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*

see attached narrative

## V.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Suffered from deprivation (denied food) and suffered from pain inflicted by conditions of incarceration - refused treatment for ongoing issues (chiropractic). Dental health also suffered greatly; had to be attended to upon release.

## VI.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

Compensatory damages based on number of days of incarceration that depreviation / infliction of pain and suffering took place (for the deliberate indifference shown by authorities).
Punitive damages for the callous indifference exhibited by the repeated acts of civil rights violations (the same acts already 'settled' in Parsons v. Ryan).

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**VII.**   **Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

A.   Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☒ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Arizona Dept. of Corrections - Alhambra (Phoenix) and 'yards' in the ASPC Douglas, Gila and Eggers

B.   Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☒ Yes

☐ No

☐ Do not know

C.   Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☒ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

Requests and complaints were filed in relation to all claims which have been filed here; in only one instance was any relief granted and that was when most of my time of incarceration had already passed. That was in relation to being recognized as a "vegetarian", however, even when such occurred I was denied access to such a diet - still denied proper food, with or without a 'diet'.

D.   Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☒ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.   If you did file a grievance:

1.   Where did you file the grievance?

At the 'immediate' level with personnel on the yard, at the complex level with the warden, and at the top administrative level with "Central Office".

2.   What did you claim in your grievance?

Grievances - re. all manner of complaints now being filed.  All of the appropriate paperwork detailing the filing of these requests and grievances has been retained and provide a complete 'track record' of this information. (We're speaking of a pile of paperwork that can be measured in inches.)

3.   What was the result, if any?

No relief was ever granted, save in the instance of (finally) being recognized as a vegetarian when all other avenues (levels) of the grievance process had been exhausted.  By that time, most of the duration of incarceration had already passed and DESPITE the "official" designation, deprevation of food continued as I was still denied actual access to such a diet (althought the food was readily available to inmates).

4.   What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  *(Describe all efforts to appeal to the highest level of the grievance process.)*

Every step of the process available was exhausted in an effort to secure the rights stated herein.

F.    If you did not file a grievance:

    1.    If there are any reasons why you did not file a grievance, state them here:

    2.    If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

    Have such information in the form of 'hard-copy' paperwork for every grievance filed and at what level - any or all of which can be made available in support of the claims made in this complaint.

    *(Note:  You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.  Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☒ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☒ No

B.    If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.    Parties to the previous lawsuit

Plaintiff(s) _____

Defendant(s) _____

2.    Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.    Docket or index number

_____

4.    Name of Judge assigned to your case

_____

5.    Approximate date of filing lawsuit

_____

6.    Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition. _____

7.    What was the result of the case? *(For example: Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

_____

C.    Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

☐ Yes

☒ No

D.      If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s)      _____

Defendant(s)    _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition    _____

7.   What was the result of the case? *(For example: Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

_____

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   10/19/17

Signature of Plaintiff

Printed Name of Plaintiff   Cary VanDerMeulen

Prison Identification #   289748

Prison Address

|  | City | State | Zip Code |
|---|---|---|---|

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney   Cary VanDerMeulen, in pro per

Bar Number

Name of Law Firm

Address   4621 E. Villa Rita Dr.

| Phoenix | Arizona | 85032 |
|---|---|---|
| City | State | Zip Code |

Telephone Number   602-283-4646

E-mail Address   cary_vdm@hotmail.com

Cary K. VanDerMeulen
4621 E. Villa Rita
Phoenix, AZ  85032
(602) 283-4646
cary_vdm@hotmail.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## PHOENIX DIVISION

**Cary VanDerMeulen**

**V**

**ARIZONA DEPT OF CORRECTIONS,**

**Charles Ryan – Director, et. al.**

Case Number

COMPLAINT

## Case against ADOC

1) Denial of basic necessities (deliberate indifference) - do not eat meat for health/religious reasons; not given proper/adequate diet when they knew from day one that I would not consume meat.  WENT THROUGH ALL ADMINISTRATIVE REMEDIES; STILL DENIED FOOD.

2) Provided ADOC with "clinical evidence" of health issue - was ignored in contradiction to existing litigation against ADOC on dietary measures as outlined in Parsons v. Ryan.  There are also continuing violations of Parsons v. Ryan on the part of ADOC as relates to medical matters (which impacted me).

3) Exercise of Religious Freedom - although (briefly) given religious diet (after many months of not being fed - due to a deliberate indifference) was still denied an appropriate/adequate diet.  When approved 'vegetarian' was

COMPLAINT - 1

NEVER provided with such; given 'vegan' beans for BREAKFAST and DINNER (about 45% of the time) with peanut butter EVERY DAY in between.

NOTE: Diet at DOC is not compliant with standards for proper nutrition as established by National Academy of Science (and others)...

ADOC 'lies' about food served. i.e. menu says cheese - given non-dairy, oil-based products (imitation garbage); menu says broccoli - given broccoli "stalks", not broccoli itself.

Non-nutritive 'filler' products are the rule, not the exception.

Much of the food is also not fit for anyone in the 50+ category (i.e. cereal is sugar-coated)

4) **Punitive action taken by ADOC in retaliation for my pursuit of a "protected right"** (the right to a basic necessity) - took the same tray of food offered to all inmates and was punished with additional time of incarceration (a LIBERTY CONDITION) for accepting a tray of food WHICH I COULD NOT RIGHTFULLY BE DENIED.

5) Improper medical treatment / procedures incl. refusal to be seen for ongoing care issues when necessary.

Prescribed course of antibiotics was taken from me upon entering ADOC and not replaced - an obvious harmful situation created by ADOC.

Potentially threatening exposure to unneeded, unnecessary 'shots' administered, that would not have been required save for negligence or refused treatment on the part of ADOC.

i.e. Needed a "tetanus" shot after being injured due to ADOC neglecting to correct a dangerous situation; however, what I received was a DPT shot.

i.e. Needed proper medical attention for back 'seizure'; received a shot of a "ibuprofen derivative" instead. Not only 'improper' treatment for the given condition (proper treatment being refused and action by ADOC not being remedial), but ibuprofen drugs have been positively correlated to increased

COMPLAINT - 2

incidence of heart-attacks and strokes. (This information is readily available online; information that was <u>not given or available to us</u>.)

Neglected/failed to provide results of diagnostic tests (even when specifically requested by patient and agreed to by provider) – violates conditions of Parsons v. Ryan

**"Couldn't get as much as a "Pepto-Bismol" for intestinal problems brought on by bad (probably mishandled) food."**

Note: As to some of these conditions, the contracted healthcare provider (Corizon) and/or its employees played a role.

6) Clinical evidence of dietary needs was not placed in medical file by Facility Health Administrator when provided to them - specified* to be prima facie evidence of improper care - care which cannot be given when medical facts are not placed in inmate's medical records.

7) Denial of access to courts - (apart from a 'deficient' library) ADOC either refused to provide the materials and assistance necessary to pursue reasons for incarceration / conditions of incarceration or the materials "promised" never materialized... as for this allegation as well as ALL VIOLATIONS enumerated, have WRITTEN and RECORDED correspondence to support.

8) Denied published property (book) of a religious nature (violation of 1st Amendment rights, on both counts) - ADOC specifically (in writing) stated nothing wrong with the book, but refused to convey due to "third-party" vendor (attempted to support an 'approved publisher' condition) when no penological interest was served in denying the material.

*Note: All of these violations are supported by laws and case citations as presented in "The Rights of Prisoners" by Michael B. Mushlin.

As mentioned, I have written and recorded documentation as to all of these violations as well as all of the documentation showing that administrative

COMPLAINT - 3

remedy was pursued (and in most cases exhausted) during the time of my incarceration.

ADOC has shown a blatant disregard of the rights of prisoners and a deliberate indifference to their health and well-being.  Continued violations of the provisions of Parsons v. Ryan make the attitude quite clear. (Potentially exacerbating the condition of indifference beyond merely 'deliberate'; calloused is more likely, and 'depraved' remains a possibility.)

I am of the opinion that unless legal remedy and punitive action is sought, ADOC will continue to have no compunction when it comes to the treatment of people in its charge in a less than human manner.


<u>Narrative</u>

What follows is an explanation of civil rights violations committed by ADOC and their representatives, hired or otherwise, that occurred during my stay. I've related these items based upon what information I was able to able to obtain from what few materials were available to me, Professor Michael Mushlin's works on the "Rights of Prisoners" and a Black's Law Dictionary. I hope the narrative portion as to who did what when and where (as asked on the complaint form) proves more enlightening (at least more entertaining) than the enumeration of  violations above.


<u>In the Beginning</u>

The abuses began at day one, going through 'processing' before being shipped-out to one of the 'yards' in the ADOC penal system.

I had been prescribed antibiotics while in the county facility where I was coming from for the illness that I was suffering... a chronic illness as it now appears to be, induced by the filthy environment there.  I had been 'sick' for more of my time there than I could count.  Plagued by chronic problems with no apparent cause, other than the fact that it subsided once removed from that environment, into the hand of the state authorities.

COMPLAINT - 4

In way of a preface, not that the attitude is itself is 'illegal', but the basis of it seems to be the root from which 'all evils flow'. The attitude in the state facility did not differ much from that of county. Essentially, we are right, you are wrong. Your rights are what we tell you they are... and the basic right that appears to be continually violated in this state, perhaps the county in particular is that of being afforded any right of being 'human'. We are a sub-species, devoid of the rights and courtesies afforded the rest of the world - we are 'criminals'. Whether we've done anything wrong or not, we are there, therefore...

(Within this context, one should realize that many people held in a county facility have not even been adjudged on any matter - that does not prevent them from being treated as if they were a 'criminal'. Once again, the 'system' says you are a criminal, therefore you are...

(guilty until proven innocent)

So, back to day one. The medication that I was prescribed and came with me into the state facility "I was relieved of". It had not been prescribed by 'them'; even though it came from another facility - that of the county. A perfectly valid prescription - issued by a medical doctor for my (named) use and mine alone; and as I was to find-out, in fact issued by the same 'outsourced' supplier of medical staff to both the county and state, Corizon Health Services.

By the state's own records from their intake processing, I was feverous with a temperature of over 100. And even though we saw a 'doctor' in short order, that prescription was never replaced. Now you don't have to be a medical genius to figure it out as everyone is told by the physician when placed on a regimen of antibiotics - the very first thing you are told - take them all until they are gone. Reason being, you could be placing yourself in grave medical danger if the 'bugs' that the antibiotics are supposed to be killing off are not all eradicated, but allowed to thrive after only being 'partially' handled... you are likely to get VERY sick. I however, was not 'in charge' of my own healthcare, they were. We are removed from any ability to care for ourselves and become reliant upon the state to provide what care we need; or, more appropriately, what care they deem necessary.

But, despite any medical indication to the contrary, this medication was taken from me and never replaced. Just the beginning of improper health and medical treatment at the hands of the state.

COMPLAINT - 5

The other 'thing' that took place almost immediately alongside the improper medical care was the denial of proper food and nutrition.  It had not been a problem in county, interestingly enough - not that the food was healthy, but at least it was 'vegetarian' or fit a vegetarian regimen.  (Not that we were properly fed there, but that's another story.)

I told the doctor that I was a 'vegetarian' and had been for a number of years for 'medical' reasons.  My own physician 'attempted' to prescribe a number of medications (drugs) to fight the 'symptoms' of elevated cholesterol (higher than what is considered 'normal') and coronary inflammation as indicated by heart-reactive protein tests.
I went on a vegetarian diet at the time, eliminating meat from my diet, and all the 'symptoms' for which he intended to prescribe drugs subsided within a period of six months.
So, as I told the doctor, I was a 'vegetarian' and told him why.  His response - not his problem; diets are a 'religious' issue and I'll have to speak to the 'chaplain'.  Such a request was made - formally, in "writing" (of sorts).  This took place the next day I believe as we were 'rousted' at about four A.M. if memory serves, in order to take 'entrance exams' (reading, writing, and language comprehension).  Being sick was no exception.
At the end of the exam was a 'questionnaire' where we were asked if we wished a visit by a 'chaplain'; regardless of an affirmative response, that visit 'never came'. I was relegated to the same diet as everyone else, and had to forgo most of the meal as a result thereof; the mainstay or main-course of the meal containing meat.  While being housed with no 'outside' privileges I traded or swapped for what I could, but as we progressed to going to the "dining hall", I had to forego all such possibilities.

My wife sent a (certified) letter to the head administrator of ADOC, Mr. Charles Ryan, requesting that I be given a 'vegetarian' diet as was medically indicated and befitting a man of my years.  The response had from a member of his staff - in essence, 'well I hope he has money to buy food (from the commissary) because we are not going to feed him'. (By the way, I have hard-copy, written documentation for all or just about all of what I am relating here - to and including one administrative submission after another placed in order to attempt to rectify the matters of which I write.)

COMPLAINT - 6

<u>Life on the Yard</u>

After a couple of weeks of going hungry, and having approached both medical and ecclesiastical staff (in absentia), I went to the Assoc. Deputy Warden Gregory and explained the situation. He said that I should approach Mr. Alex Ruiz, the coordinator with Trinity Food Service and ask him ("as a favor to ADW Gregory") to place me on the 'vegetarian' (vegan) list until such time as my 'paperwork' came through. This transpired within a couple of days, and things went well - up until the time I was transferred to another yard.
I think some clarification might be in order here as to specifics and those things to which I alluded, but have just been left 'hanging'. I was told that there is no such thing as a 'vegetarian' diet. That it was either 'vegan' - no animal products at all (i.e. milk or eggs) or a 'regular tray'. (There was also a 'kosher' religious diet, but that didn't come into play.)
As I say, things went well for a while. Even though listed as a 'vegan', if the breakfast included eggs, I could take a regular tray. If not, and the fare that day included meat, I would take the 'vegan' tray, say that "I'm vegetarian" and they would throw me a milk with the meal.

As far as the paperwork coming through, that took so long that I would have died of starvation before it ever occurred. My diet therefore became a constant source of problems - for me in order to obtain sufficient food and nutrition; for them, having to continually hear about it. Like I say, innumerable requests and denials, every step of the way.
Medical would continually deny and/or defer. As far as I religious diet was concerned, that had to be approved by the head chaplain, Chaplain Donnelly, a man I never did meet.

All of the paperwork in that regard was relayed to him by other, or another, chaplain on staff; one who had a little more regard for the well-being of men on the yard, but then it wasn't up to him - all I ever got from Donnelly was a denial of any 'religious' diet - as if it took religion of any kind to have to eat or be fed. Donnelly left shortly thereafter, with no replacement for a period of time; that's why the comment that I was denied "in absentia".

Things got even more interesting when I was 'administratively' moved to another yard within the Douglas complex, Eggers. They apparently neither had the ability nor the inclination to be 'obliging' to anyone who didn't take a

COMPLAINT - 7

regular meal.  If I recall correctly, I was in fact the only 'vegetarian' on the yard...  "vegan" in this case - as the term or treatment of being "vegetarian" did not exist in their vernacular.  No more was I afforded the "luxury" of being able to pick or choose the tray of food being offered, befitting a vegetarian - even when that food complied with such a diet.  No, I was being made a 'special' tray and I was "going to eat it and like it".  Only problem was, even that tray did not conform to the "pre-planned" diet that was to be served to a 'vegan' that was in custody.  Such was the providence of the dictates which came from 'higher-up' and the food staff was expected to comply with such regulations.  I did have conversation with the kitchen 'manager' on more than one occasion concerning this, a Mr. Valencia, or just "Valencia" as he was called.  He had no inclination to meet with the condition of the prescribed diet, even though he passed it off as being so...

He said "all food was by weight" and that the diet was as "prescribed".  Only thing was when pressed on the matter, including being directed by the head of security staff, a lieutenant, to have the food weighed or inspected, he declined.  It was only after I was able to obtain copies of the "prescribed" diet through a member of the 'administrative' staff, my "CO III", was I able to verify that in fact, the food being served was not compliant with the 'prescribed' diet.  Maybe mandated would be a better term, but I think you get the idea.

For example, (the xxxx hit the proverbial) one night when I was to given some "vegan chili" and what I got was a plate of noodles (spaghetti) seasoned with a little chili powder.

Once again, I presented myself with tray in hand to the (security) staff member with a complaint about what I was being given to eat.  This time, in defense of themselves, the kitchen staff pulled out the recipe book that contained the ingredients and preparation guidelines for the "vegan chili".  It was apparent that a few items were missing; like the whole meal aside the noodles.  No peppers, no sauce, no TVP (textured vegetable protein - a soy product).  For the first time, I actually got an apology from the member of security staff who is usually stationed in the kitchen to 'oversee' things.  Up until then I had been treated by them as some "grousing old bastard" who had nothing better to do than complain...

They actually became sympathetic that the meals I was being offered (that or nada) were so lacking.  Come to think of it, now that I'm on the outside and have access to information - I might have been better off without the soy product.

COMPLAINT - 8

Did I mention access to information?

That's right, one of the things that we are denied to access to any 'real' information.  If it isn't provided by TV or a book (if one could find any reference materials), then it didn't happen. We were essentially quarantined from the outside world and access to any 'real' information like I say, was denied us.  First and foremost - the world's library, the internet... But then again, that's another story.  That and the fact that even if we ordered a book that might contain valuable information concerning a particular topic, we were denied it.  It and the first amendment right that it represents, and for the most frivolous of reasons - certainly nothing that resembled a "penal interest". On this, there is some controversy even at the highest levels judicial levels. Concerning the right of access to published materials the courts have been divided on what is 'befitting' the interests of first amendment rights.

The most significant opinion that I can recall is comment on depriving a population access to printed materials is tantamount to deprivation of "food for the soul".

But, then, I digress from the main topic of discourse - back to food.

[The fact that we were denied the right of access to printed materials is better detailed in the grievances submitted concerning this matter; that and argument concerning the 'marketing' of such materials in an information age.]

Now, as far as "Valencia" was concerned, I'm of the opinion that he lied in more matters than just being 'compliant' with the dictates of the menus that he was mandated to fulfill; pretty much as well as his capabilities or at least responsibilities of meeting the duties of his job.  I became aware of this when I met with him in the warden's office and became conversant with what had been conveyed to the deputy warden by him.  But then, making fabrications is probably the least of his culpable acts when it comes to his responsibility of seeing to it that the men on the yard are being fed proper food.  There is much more of that story about which I could write, and I shall, but I want to present it in some coherent order so as to provide a more complete picture of just how bad it got at times.  To touch briefly upon these matters, let me outline a couple of issues.

1)  The menus, even as provided, are quite often "lied" about when it comes to the actual food received in relation the what is specified on the ADOC menus. Menus which provide the basis upon which meeting with ADOC's own

COMPLAINT - 9

responsibilities of compliance with the provision of a minimally mandated amounts of nutrition for penal institutions.

When the menu says cheese, what is most often actually provided is a "cheese substitute", a synthetic product produced in a "lab" that has nothing to do with what comes from a cow.

A synthetic oil-based product passed-off as cheese, but which contains no dairy. It certainly does not meet with any nutritional value that would be attributed to "cheese" and that is because it is not.

When the menu says "broccoli" what is most often served is broccoli <u>stalks</u>. You know, the part of the broccoli that would normally be throw away after the nutritional part, the broccoli head, has been removed. And that is what we are given when it says "broccoli", but a fraction of the nutritional value thereof.

A proper diet of vegetables and fruit is rarely if ever seen. The vegetables being prepared by 'old fashioned' methods, not that any are 'fresh' anyway, outside of the lettuce used for a salad (little of any nutritional value there), but the 'preserved' vegetables prepared are often 'soggy' having been boiled in water where most of whatever nutrition it has (or had) remains.

Fruit, what is that? Never saw a piece of it since entering the custody of ADOC. When questioned about it, I was told that the inmates "would just use it to make pruno, anyway". For those not familiar, the term "pruno" refers to a fermented beverage obtained from fruit juice.

Due to these factors, I am relatively sure that the minimum federal standards established for the feeding of an inmate population have not been met by ADOC. This affects a whole lot more men (and women in similar institutions) than just those with various dietary 'restrictions'. It effects the entire population of these institutions for the duration of their stay... a little more significant in the 'scheme' of things than just the denial of food to particular inmates. And, what I think has to be kept in mind, even though this is an individual suit against the Arizona Dept. of Corrections, what happened to me is happening to everyone in a similar manner who find themselves in the custody of ADOC.

2) Aside from the nutritional value of the food being served in DOC, a proper diet befitting men of a 'certain age' is totally lacking. That would be would the inmates termed in the language of those who pursue penological interests, the "over 50" crowd. The diet is by and large 'carb' intensive, which may be fine for younger men, but... Hell, when I was one of those, yea, I could eat

COMPLAINT - 10

practically 'anything' and still 'survive'.  Now that I've have survived myself and fit into the 'over 50' crowd, such is not an option if one wishes to remain 'healthy' or living at all for very long.  Breakfast cereal which I could normally eat (on a vegetarian diet) was more often than not "sugar-coated".  (Really, "Fruit Loops"?)
Not fit food for men of advanced years.  Not unless you want to be 'pushed' into old-age diabetes.  A "take it or leave it" proposition.  No thanks, I left it.  Better to go hungry than to 'kill' oneself with what is provided.

Even if ordered from the 'commissary', a nice healthy "granola", the first most predominant ingredient, sugar.  And this stuff is supposed to be healthy?  Not that we had any choice in the matter...

Did I mention the 'racket' of providing for the inmate population?
The services which are contracted for by the ADOC are given to 'select' companies, the particulars of their patronage, ownership and relation to the department would certainly be in question, given that fact that, any food or service provided costs over and above that which could be found "in an open market".  The cost of items from the commissary are quite often higher than would could be found at your local "convenient store" which we all know "carry a premium" for convenience, over and above what is available at the market.
And, from what I understand, these prices are 'regulated' by the ADOC and 'allowed' to be increased in cost only so much per year (a percentage of the already over-priced list).
The cost of phone calls (outgoing only, if one has the "privilege") are astronomical on a per minute basis as compared to what the rest of the world pays for communication costs.
The food service, an outside contractor given the responsibility of meeting ADOC guidelines (as well as those mandated federally) for the feeding of an inmate population.
The medical services provided, an outside contractor.  All of these 'vendors' are given 'exclusives' by the ADOC and when there are violations of federal laws and guidelines, they certainly play a part in the scenario.  But, the one thing that they all have in common - they are under the control of the ADOC whose ultimate responsibility is to see that federal laws and guidelines are in compliance.  It is the ADOC whose actions (apparently habitually and by their

COMPLAINT - 11

own dictates) are in violation of these laws and guidelines, including civil rights violations as outlined in this suit.

For the time being, I will set aside matters of morality and concentrate on those issues arising from 'legalities'.  The violation of federal laws of the highest order, civil rights violations and those rights as conferred by the Constitution of the United States.
Although, I must say for a man of years who has been around 'a little', some of the things that I witnessed were out and out 'wrong' by any measure of decency.  And, in many ways, a far cry from the concepts of "penological interests" that have been formulated, but apparently, not very well adhered to. For anyone truly interested in what those ideas (ideals) and concepts are, I would urge some study into what was proposed back when by Dr. Rush and the concepts that he put forth.  That, and the lessons learned early on in this country from penal institutions established in New York state and in Pennsylvania.  This information is available online (I'm sure) as well as in most good encyclopedias - the only source of information available to me at the time.  It makes for very good and interesting reading, especially if one finds oneself in such as position as to be witnessing its application firsthand.

So, back to "Valencia".  Things really came to a head when I was directed (by "people in the know") to submit a complaint on the food service to his boss, Mr. Alex Ruiz.
The response had from Mr. Ruiz - did it entail taking care of his duties and "policing" the kitchen?  Two words on that.  "Hell" and "no".  Mr. Ruiz could not be bothered with seeing to it that the food service was in compliance with ADOC mandates.
Not the last time that an 'unfavorable' response was to be had from this man. His position by the way - he is the "coordinator" between the (contracted) food service and ADOC.
As to his response in this matter, he had a much simpler idea, since my "paperwork had not come through" as yet, I was not 'entitled' to be fed. 'Stop feeding him' was his answer (real humanitarian that he is...)

Actually, a particularly corrupt individual, who, although he was the "coordinator" between the food service and ADOC he was responsible for the serving of 'tainted' food to the men.  He certainly needs to be a named party in this suit as through his actions which were serving only to himself and his

COMPLAINT - 12

position, being much to the detriment of the men who he was responsible to 'feed', did promote the serving of 'tainted' food to the men and even sat in front of us and attempted to lie to us about the food's condition. (*With the deputy warden's backing on this one, DW Langham, the head of the yard at Eggers.) A condition we were all well aware of, despite any declarations to the contrary, since we were the ones to whom the food was being served.

Before I left DOC, I had amassed a petition of over fifty signatures protesting the condition of this particular food item, on a yard of a couple hundred men, many of whom were off the yard working during the day. This was presented to DW Langham, much to his consternation I'm sure, as he had previously announced to the men as a whole (at least those available during the course of the day), that he never wanted to see one of those "group complaints". Unfortunately (or maybe fortunately) I was not there to witness the outcome of that one.

I took my leave as I was told I could go - or, maybe I was kicked-out, not that I attempted to stay.

*Now, I would have to say that DW Langham was a descent sort of guy. Very sharp and "on top of things" that went on in the yard. I mention this because it is not my intention to implicate him in any wrong-doing. I am of the opinion that he 'backed' Mr. Ruiz's play because of the environment in which he operated. In many ways, he had to remain a 'team player' in order to accomplish the goals of his job and work in the role that he played within the organization. I had seen on occasion (more than once, but not frequently) where the "official word" changed with the 'politics' of meeting the demands, wishes, or feelings of others with whom he worked, or those who would have otherwise answered to him.

(Although, I certainly would draw the line at, "I was just following orders" when it comes to committing any act that might be considered an 'atrocity'; or even an 'illegality' as the case may be.)

Along those lines - I do have an enlightening story which would fit right in with the concept of an 'atrocity'. It was something I ran across in one of the 'dorms' in which I resided on the Gila yard. The dorms had large 'community' waste receptacles located at various places within the dorm, or around the facility. Large, multi-gallon garbage cans is what they were. Plastic in construction and usually green in color. One of these in particular caught my attention one day as unlike most of the others, it had large white letters

COMPLAINT - 13

imprinted on it which said, "USDA Condemned".  That really got me thinking about why such a container would be there, or just how it might have come into being.  I really don't think that the USDA has an 'excess' of such containers that they are distributing them (sans contents) to various other governmental organizations; which leads me to only one other consideration...

Oh yea, Mr. Valencia.  He was eventually replaced on the yard.  Can't say what became of him, but I would guess that the 'powers that be' couldn't lie to themselves forever.

As to Mr. Ruiz, that is another matter.  My 'paperwork' had come through in relation to my diet and I approached the DW to request that I be given food in keeping with the approved (vegetarian) diet.  The discussion was along the lines of, "Yea, we were wondering who approved that...", although the paperwork from "Central Office" did indicate who (I know, I've got it.).  The response was presented in the manner of questioning whether the authorization of such 'would be recognized'.  Langham deferred to Alex Ruiz and, once again, I presented an issue to Mr. Ruiz as the food coordinator to have items that are served to the 'rest' of the inmates that are befitting a "vegetarian" diet made available to myself.  It was not a question of "could", but "would" he inform the kitchen to do so (in keeping with the authorization from "Central Office")... nor did I ask any special treatment.  I asked that it would be provided me <u>when</u> it was served to the population as a whole, in lieu of being relegated to a strictly 'vegan' diet.  He refused to comply with the order from Central Office and, as before, continued to deny adequate and appropriate food to an inmate.

In the Interim

Here it is, another day and another day of torment at the hands of my 'captors'.

The pain I suffered was being 'inflicted' upon me on an almost daily (nightly) basis.  I'm an old man with a 'bad' back (and neck) - injuries from auto accidents (for which I was not responsible, yet suffer from nonetheless).  I've been seeing a chiropractor since 1994 and was still under such care when incarcerated.

Now, from what I understand, as to any basis of law of which I have knowledge, the concept is that 'you takes them as you finds them'.  If ADOC is

COMPLAINT - 14

going to incarcerate old men, the sick, or the infirm, they are responsible for providing the care that they are no longer able to provide themselves.

So, I have a bad back and am forced to recline for the evening (sleep) upon a 'mattress' that provides little comfort, especially as it sits atop a solid STEEL frame. I did find-out early on that "medical" mattresses are provided, or a 'double' mattress in lieu thereof. Only to 'soften' a blow that was invariably delivered. I would wake up "stiff", leading to much discomfort and pain. (It was either the steel slab or a concrete floor, take your choice).

On more than one occasion I requested chiropractic care when the discomfort became too much to bear, needless pain from both a stand-point of having it inflicted and from the stand-point of there being available remedy through 'spinal manipulation' to get the 'kinks' out. On every occasion I was denied and when I pursued it was told, "It is not a fatal condition." Meaning, if I'm not 'likely' to die from it, 'they ain't going to do a damned thing about' - incapacitation, long-term debilitation - none of that matters, as long as I don't die on them in the interim; despite the concept that 'additional' pain and suffering being inflicted 'beyond the terms of incarceration' is not acceptable, another matter altogether.

It got so bad that one morning I arose to find that ANY movement - sitting down, standing-up, attempting to walk, brought excruciating pain. Beyond "baby steps" I was not mobile, to the point that one corrections officer asked if I needed a wheelchair. This had been brought on by another rough night, and apparently my back being 'tweaked' and kinked to the point of bones resting upon nerves. More than a baby-step and I was likely to fall on my face as 'shooting' pain ran up and down my legs. I was already scheduled for a dental* exam that day if I recall rightly. So, as I was already going to the Mohave yard where most of or the more involved medical treatment took place, they endeavored to have the nursing staff 'take a look at me'. I was told, once again, that chiropractic treatment was not [going to be made] available, although I pretty much knew that as long as the nerves in my lower back were being impinged, I would continue to have muscle spasms and pain. One of the nurses in particular was familiar with conditions where muscles would seize-up as she had on occasion gone to the hospital to get a shot that would relax the muscles and alleviate the seizures as well as associated pain. However, she indicated that "I wasn't getting any of that, here." The 'best' they had to 'offer' was something she called a ibuprofen 'derivative', "if I wanted to try it", intravenously in the 'butt'. Try it? Anything to make the pain stop was motivation enough for me, even if I had to bare my bottom to do it. Not that it

COMPLAINT - 15

did a thing but leave me with a bad 'metallic' taste in my mouth.  No, proper
medical care - that which was indicated by the condition being suffered was
not to be had, not while in the custody of ADOC.

*As to dental, I might add that the level of care provided while incarcerated
amounted to little more than an exam and [only] one 'cleaning' in a two-year
period.  I had requested further care, but only received notification that I was
"on a waiting list".  The condition of my oral health became so deteriorated
while in custody that I was subsequently told by more than one dentist that I
would have to (and did) undergo extensive 'perio' treatment before any
normal 'maintenance' routine could be resumed.  Meaning that the condition
of my gums had so deteriorated due to not receiving proper treatment while
in the care of ADOC that I needed to have major work to come 'up to snuff'.
Work which is normally indicated for an aging population where more
problems arise from gum disease than from 'cavities'.  (Conditions recognized
as having potentially adverse effects on the overall health of the body and
organs.) Something that ADOC totally ignored.

So, in the interim, while waiting for my "paperwork to come through", which
encompassed more of my stay than not - pretty ridiculous actually, when a
man has to eat every day, yet the 'demands' of a bureaucratic process dictate
that someone else certify that which he is known to be, has declared himself to
be, and has practiced on a daily basis, despite the deprivations it imposes.
In fact, many a time did I write to the chaplain who was loath to certify a
vegetarian diet for "religious reasons", although (I was told) there was "no
other reason" for which ADOC would recognize someone's need for a
particular diet.  (In contradiction to the settlement reached in Parsons v. Ryan
as I was to discover).
Of the many reasons offered him, passages of scripture, or extolling one's own
beliefs, none would he adhere to as being 'sufficient' enough reason to be fed
adequately.  And of these, one of the most significant I can recall without
referring to the myriad of paperwork which deluged the man on my behalf
was the statement, "When we know better [if we are Godly], we do better."
Better to others, better to ourselves.  And that would include not doing those
things which we know to be of detriment to us.  I do not smoke (anymore), I
do not drink (anymore) as a result of these beliefs.  Neither do I consume food
which I know to make me 'sick'.  The man was not swayed.

COMPLAINT - 16

Yes, Chaplain Donnally had been replaced.  And, I'm not sure that was a particularly good thing - nor can I say, not having met the man.  But, as to the new head chaplain, Chaplain Herman, I can formulate a definite and strong opinion.  He is not a particularly godly man.  He could care less if his fellow man eats or not; in fact, for months on end he stood in the way of my being granted "the right" to eat a descent meal.  By ADOC regulation, he has to respond to any request or complaint within thirty days.  Each and every time that paperwork was submitted to him, he waited a <u>full</u> thirty days before responding, just to deny the request.  THREE TIMES OVER did he deny me.  (And, I don't think he has the good sense to see the irony in that.)
In fact, the first time I met the man, shortly after he assumed the position as head chaplain, we had a brief discussion of my 'religious' reasons for requesting a vegetarian diet.  He met with me most immediately, "as a favor to the warden" (Deputy Warden Langham, who had asked him to do so on my behalf).  At one point I quipped, "I'm actually a 'pescatarian', but don't hold my religion against me."  Chaplain Herman is a particularly humorless* man.

By the way, you'll never see a piece of fish served on any ADOC meal; not as much as an ounce of tuna out of a can.  OK - I lied, I did see one piece of fish delivered to a 'black' man from a Baptist family who was on a 'kosher' diet.  (Me, I can't even get a decent meal out of these guys; go figure.  Should I consider converting?)

The Facility Health Administrator, at the time, was a position held by Ms. Deborah Kinder.  Although perhaps contracted through Corizon Health Services, she held the ADOC position / title of FHA.  I only make mention of the fact in case the relationship makes any difference from a legal stand-point.  Anyway, she was "answering" for ADOC at the time in her position as FHA.
I wrote (more than once) to medical concerning my needs.  The last major effort of which I have immediate recollection included documentation on my (previous) blood work that I was finally able to obtain, showing my condition before (on meat) and after (off meat), along with a full explanation of my 'physiological' history and make-up.  Not the least of which was the fact that the drugs (statins) the doctor had attempted to prescribe to 'fight the symptoms' from which I was suffering while still on a diet that contained meat, my father had almost lost the function of his kidneys while taking; indicating the possibility of a "genetic predisposition" to such drugs.  (Something that a

COMPLAINT - 17

doctor should understand.)  Meaning, the 'supposed' cure could be far worse than the 'disease'.

(Yes, I do still have all the paperwork on this also - more involved than a paragraph or two.)

Her response had to be the most ignorant that I've ever heard from a medical professional.  Her statement amounted to, 'Well, your blood work shows that your fine now so you can eat a 'regular' meal; comprised of "heart-healthy" turkey'.

So, let's break this down.  Now that my health is fine (and I'm drug-free) because I've refrained from eating meat for all of these years, let's resume eating the very thing which made me 'sick' in the first place.  Oh, and besides that, it's "heart-healthy".  My reply was pretty much on the order of 'are you out of your fn mind'?  (I was a little more tactful than that, but you get the idea.)

And, my 'besides that' response was, 'Do you really intend to tell me that eating ANY meat is healthier for your heart than eating vegetables?'

Yes, it was pathetic; reprehensible in fact, considering her responsibility to the health and well-being of those in her charge.  There is no excuse for such a blatant wrong that would deny someone the right to a proper diet and nutrition, let alone from someone who is supposed to be a medical professional who should abide by the oath of, "above all else, do no harm".  More specifically in this case, she is in violation of Parsons v. Ryan 'settlement agreement' as to provision of a diet that is "clinically indicated" as evidenced by the lab results presented her.  (see reference to Parsons v. Ryan, following...)

Lest I forget, this woman also failed to include copy of the paperwork I sent her that was indicative of a medical condition.  From what I understand, prima facie evidence of a violation of civil rights in relation to medical and health care is to NOT place the medical history / records of a known condition into an inmate's medical file - reason being, "it is not possible" for them to receive the proper care if it is not documented (known) or record made of it.  The records in question were from a well-known, certified lab that various doctors send blood samples to for analysis.  As a healthcare practitioner and in particular as the FHA, she should be fully cognizant of the implications of not keeping / maintaining proper medical records.

COMPLAINT - 18

Note: I did discover on one piece of paperwork from Central Office a reference to the "Corizon Site Manager". I inquired as to the FHA and the site manager being one and the same. It was confirmed, hence the inclusion of Corizon in this case.

Speaking of blood work - yes, it had been 'ordered' for me, but it was only done the one time. Reason being, I refused to have my blood taken after that. Based on what the FHA had said, essentially, "We're going to feed you all the crap you know you shouldn't eat; stuff that will make you 'sick', but don't worry, we're going to monitor how 'sick' you get."
But, that was only the 'icing' on the cake; to be told the reason that blood work had been ordered for me. Mainly it was the fact that they <u>refused</u> to give me the results of my blood work. Normally, when one gets blood taken and analyzed, what happens? Your doctor as a professional calls you in to his office and sits you down to tell you the results, right? (I guess it's assumed to be bad news; why else would they always have you sit down?)
Well no, they aren't too professional in ADOC. No such request, no review, no explanation.
I requested the results. First verbally, then in writing (of which I have a copy, and a response). And, the verdict is, "normal". Quite a response, huh?
No numbers, no explanation of what is reflected by numbers, NADA.
I sent additional paperwork to explain that "normal" is not results. No further reply.

However, I did find specified in the "settlement" on a class action suit against ADOC, Mr. Charles Ryan named as the Director concerning the case.
The case is Parsons vs. Ryan - two of the specifics in that case that were agreed to in settlement of the case follow. I found reference to the precise numbering used; there were over one hundred conditions placed upon ADOC activities due to violations.

Measure #47 - A Medical Provider will communicate the results of diagnostic study to the inmate upon request and within seven calendar days of the date of request.

Measure #71 - inmates with diagnosed and documented diseases OR conditions that necessitate a special diet will be provided the diet, if <u>clinically indicated</u> (emphasis provided)

COMPLAINT - 19

These were conditions to which ADOC had agreed in settlement of a Federal lawsuit concerning civil rights violations, and here they were, violating the same conditions which they had agreed not to violate.

If my understanding is correct, Mr. Charles Ryan cannot (normally) be sued personally, but is sued professionally in his official capacity as the Director of ADOC.

However, if I'm also not mistaken, this "professional immunity" from wrong-doing only extends so far... if the party in question is or has known to be in violation and continues said activity, they no longer have the protection of their position as a public official.

Mr. Charles Ryan is not deserving of such protection.  To have civil rights violations and to continue with such violations in the same vein is not at all acceptable.

If any of the named individuals in this filing can be held personally liable for their violation, in addition to their professionally conduct, I see no reason why it shouldn't be so. With full knowledge aforethought, they did wrong and I don't see why any such immunity should be extended.

### As to Parsons v. Ryan CV12-00601-PHX-DKD

The case of Parsons v. Ryan was in progress at the time that I was 'in the throes of it' with ADOC in relation to particular items pertinent to this case. As I recall, input was being sought at the time concerning the 'conditions' of the settlement and information as to this was posted around the ASPC.  I availed myself of the opportunity to be of some assistance in the matter as I did have an intimate knowledge of the state of health and medical care given at ADOC.

A sixteen page letter (16 pages - handwritten, double-spaced) was produced outlining the same and was distributed as follows:

1)  Through CO IV Frisbee copies were distributed to Charles L. Ryan - Director of ADOC and one Mr. Richard Pratt - Interim Division Director of Health Services.

COMPLAINT - 20

2) A copy to the Clerk of the U.S. District Court, presumably to be made available to the judge in the case.  (should be on file - makes for a good read; sent 1/21/15)

3) A copy to each of the law firms instrumental in bring the class action suit - the ACLU National Prison Project and the Prison Law Office

As to any response had, one "form letter" received from the Prison Law Office concerning submissions.  As, apparently, Mr. Charles Ryan (and Mr. Pratt for that matter) were not 'phased' by being informed that ADOC was still in violation of some the very same issues that were raised in Parsons v. Ryan, despite the fact that an agreement not to continue such acts was in the process of being ratified.  (Does that qualify as 'depraved' indifference?)

## A Continuing Saga

The good news, when all of this was said and done, and every possible avenue exhausted(you can only register so many requests or complaints about something, per ADOC 'regs'), finally, 'someone' (the Director of Chaplain Services, Chaplain Linderman, who I had appealed to) in "Central Office" (headquarters of the Grand Poobah himself, Mr. Charles Ryan - definitely a named party to this action) conceded to the fact that yes indeed, I was a 'vegetarian' and here is the paperwork to prove it.  I am now to receive the honor and full accord of a complete, healthy, wholesome, nutritious meal (on a regular basis), or so I thought.
And what made me think that, you ask?  How, about because "Central Office" is the final word of the administration on what [does or does not] go on in 'their' facility, the ADOC.
Only one little problem with that thought - no one else subordinate to the head office was of the same opinion.  I was denied proper food for the duration of my stay either way; and, with the exception of a brief period of time at the behest of ADW Gregory, that was the case for the entire time I was in the custody of the ADOC.

Chaplain Herman had to relinquish and 'grant' me a 'religious' diet.  Except, it was not 'vegetarian' as was stated in the paperwork from Central Office.  It was a 'vegan' diet which excluded not only meat, but all animal products; no milk, eggs, (protein source), whatever.

COMPLAINT - 21

I had beans shoved-up my other end both morning and night, with a little peanut butter squeezed in between (for lunch). Check-out the menus (I've still got them and they can be submitted in support of these statements); and I'm not exaggerating (much). Without adding it up, roughly 40-45% of the time, that is what you get, or mix-it-up with a little TVP and some noodles, among other things.

These guys are so ignorant of what a healthy, balanced diet means that I can't even begin to explain... how about with the fact that one day, "Jell-O" (gelatin) showed-up on my plate. How's that for 'vegan'? (No, it doesn't qualify for 'vegetarian' either.)

That was fine. It was certainly more food than I got otherwise and it went on for a while. Until one day. The day that I would have to say the 'vultures' had been waiting for...

I was accused of taking something (heaven forbid), that "wasn't on my diet".

Never mind that there was no basis for such a claim - the food "taken" was the same tray that was offered everyone else, AND absolutely it conformed with a "vegetarian" diet as I was authorized by Central Office to receive (and should have been given).

Never mind that it was absolutely acceptable for me to take a 'vegan' tray or a 'regular' tray if it fit my diet while I was on the Gila yard.

But NO, this was just TOO BIG an opportunity to pass up; a chance to slam VanDerMeulen for being a PITA. I was charged with violating a direct order - a major offense which is entered into one's "permanent" record of their stay at ADOC.

Yea, I collected a couple of 'minors' before - just some ridiculous stuff that got you time doing "extra duty" - picking -up the yard after all the slobs who didn't bother putting their trash and 'butts' where they belong. Even disputed an items or two that wasn't exactly true, not that it got you anywhere, but it was real interesting to find-out that they intended to put you on detail even if the charge had been disputed (appealed).

So let's see, your goin' to take your punishment, even if we decide you were innocent ('er "not guilty") after all. (Like that was ever going to happen), but that's the ADOC way...

COMPLAINT - 22

Got to remember the "first" (unwritten) rule of ADOC - We're right, you're wrong, and even if we're not right, you're still wrong.

So, here was their chance.  And, I'm not talking some conspiracy where people are lining-up to take a shot at me, but there are a number of 'unscrupulous' or unprincipled people at ADOC who get their 'jollies' from messing with other people.  You can tell who the 'vultures' are... "where there is a carcass, there shall they be."  Reminiscent of the chaplain, Chaplain Herman, right in line with the rest of 'them'. The man who would take a month to deny a request for a proper meal was "Johnny on the spot" the very next day in order to see to it that food would, once again, be denied.  (You can check the paperwork on this one - I don't want to name names... but in this case, I will.)

Upshot of it was this.  A complete "kangaroo court" headed by a Captain that I'd never previously met, Capt. Paul Martell.  He didn't much like me from the 'giddy-up' because I had something to say about it, was willing to stand my ground and represent myself as to the facts of the matter - there never was any order given (written or otherwise) that had been violated.  (No order, no possibility.)

I showed him the dietary "agreement" that had been presented me by Chaplain Herman.  Nowhere was there to be found any verbiage concerning an "order", or anything of that nature.  At most, it stated that my diet could be 'pulled' for a period of six months if it was not adhered to; it did not include any indication of 'disciplinary action' in addition thereto.  That, despite the fact that I had a document from Central Office that stated I was to be recognized as being a vegetarian (not a vegan), and that the tray of food, the same as offered every other inmate, conformed with a vegetarian diet.  A document he refused to look at... that and several pages of writing I had done the prior evening in support of my 'case'.

This he shoved aside and at the conclusion of the 'disciplinary hearing' when I reiterated that there was never any order given to violate, he got belligerent and told me to "gather my papers and get out".  I said "OK, give me a minute" (as I gathered-up what he had 'strewn' across the desk, as opposed to looking at it).  He responded with, "Take this crap off my desk, right now".  "And, that's an order."  During the course of the "interrogation" the only infraction that I could determine had ever occurred was committed by the Captain himself.

COMPLAINT - 23

He violated ADOC policy* in not providing me a chance to present "my side of the story" as was documented.  That, and the tenants of any actual 'hearing' that is conducted - the right of the accused to answer the charges.

*under Department Order 803 – the right to present evidence both verbal and written.

Note:  Capt. Martell was aided and 'abetted' in these actions by one CO III Lomeli*, about whom I did document inappropriate activities on her part that comprised the production of falsified documents and the rendering of false statements.  Due to the very incendiary nature of its contents it was only reviewed (viewed) by a security officer and retained (under advisement) for future reference...  filing of these charges while still residing on the yard may have led to reprisals on the part of a person or person(s) who had already proven themselves to be unscrupulous in their actions.
(*if not instigated by her as the "Disciplinary Officer" on the yard)

This is an issue of major import as the 'result' of the "hearing" was the imposition of time being 'added' my sentence, or additional time of incarceration by refusing to recognize "good time" that had been accumulated. I received paperwork from ADOC subsequently, stating that I had been found 'guilty' of disobeying a direct order by security personnel and the imposition of the additional time...  (Yes, I did dispute this and have the paper 'trail'.) Before I left ADOC, I also received more paperwork extending my stay even further with no rhyme or reason for it.  I went to a CO III concerning the issue and put in paperwork requesting an explanation as to the 'time calculation', but never received an answer prior to discharge.  All of which, from my understanding, represents a "liberty interest" in relation to my incarceration. Rights that were violated at the whim of ADOC and its representatives.

<u>Epilogue</u>

So, how did I survive for those many months?
For food, I did just what was suggested by one of the sergeants on the yard (they rotate).
He suggested that I "swap" food with other inmates so that I can get something to eat.

COMPLAINT - 24

Now, between you and me, I can tell you that it is strictly against 'policy', reason being, it's possible that an inmate could be "coerced" into giving-up his food to another inmate.  Good reason for the rule.

In this case, no one paid particular attention to it because they were all aware (or mostly aware) of what I was going through.

Yea, I gave-up the mainstay of the meal, the largest portion thereof, because it was usually comprised of meat or some kind of a meat dish, in exchange for some of those 'soggy' vegetables, some salad, whatever.  That and the fact that my *wife "bent over backwards" (suffered financially) to see that I had some money on my 'books' each month so I could place an order with the commissary every couple of weeks to obtain something to eat.  Whatever they offered that might 'fit the bill'.  The choices weren't great, but as Central Office had said (in so many words), 'I hope you have money or you're going to go hungry.'

As far as the condition of my back, in order to keep from seizing-up with back pain I would have one inmate or another "pick me up" to realign my back.  I'm pretty sure this would have been 'frowned upon' had any of the correctional officers known about it, but given the disregard for my physical well-being already exhibited by ADOC...

(Wasn't of much help in the case of lumbar issues, and as far as my neck was concerned - nobody was going to touch it if they weren't a doctor.)

*former wife - incarceration does wonders <u>for</u> personal relationships
Didn't do much for my business of over twenty years, either.


Dated this 19th day of October, 2017

Cary K. VanDerMeulen, In Pro Per

COMPLAINT - 25