Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

FILED ___ LODGED
___ RECEIVED ___ COPY

JUN 29 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

### for the

### District of Arizona

### Phoenix Division

|  |  |
|---|---|
| **Cary VanDerMeulen** | Case No. ___CV-17-3828-PHX-JAT-DMF___ |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | *Jury Trial Demanded* |
| **-v-** | *2nd Amended Complaint* |
| **State of Arizona, Dept. of Corrections** | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)* | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### (Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Cary VanDerMeulen |
| All other names by which you have been known: | |
| ID Number | 289748 |
| Current Institution | Released |
| Address | 4621 E. Villa Rita Dr. |

| Phoenix | AZ | 85032 |
|---|---|---|
| *City* | *State* | *Zip Code* |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Charles L. Ryan |
| Job or Title *(if known)* | Director of Arizona Dept. of Corrections |
| Shield Number | |
| Employer | State of Arizona |
| Address | 1601 W. Jefferson |

| Phoenix | Arizona | 85007 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity   ☒ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Deborah Kinder |
| Job or Title *(if known)* | Facility Health Administrator - ASPC Douglas |
| Shield Number | |
| Employer | ADOC / Corizon Health |
| Address | 6911 N BDI Blvd. |

| Douglas | Arizona | 85607 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity   ☒ Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3

| | |
|---|---|
| Name | William Brunhofer |
| Job or Title *(if known)* | Facility Health Administrator - ASPC Douglas |
| Shield Number | |
| Employer | ADOC / Corizon Health |
| Address | 6911 N. BDI Blvd. |

| Douglas | Arizona | 85607 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity     ☒ Official capacity

Defendant No. 4

| | |
|---|---|
| Name | Chaplain Herman |
| Job or Title *(if known)* | Head Chaplain - ASPC Douglas |
| Shield Number | |
| Employer | Arizona Dept. of Corrections - ASPC Douglas |
| Address | 6911 N. BDI Blvd. |

| Douglas | Arizona | 85607 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☒ Individual capacity     ☒ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  42 U.S.C. § 1983.  If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Eighth, First, and Fourteenth amendments of the US Constitution

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights.  If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Defendant #5

Alex Ruiz
Coordinator of Food Services
Arizona Dept. of Corrections - ASPC Douglas
6911 N. BDI Blvd.
Douglas, Arizona  85607

in both a professionally capacity and individually

Defendant #6

Meegan Muse
Warden - ASPC Douglas
Arizona Dept. of Corrections
6911 N. BDI Blvd.
Douglas, Arizona  85607

in both a professionally capacity and individually

Defendant #7

Capt. Paul Martell
Corrections / Discipinary Officer
Arizona Dept. of Corrections
6911 N. BDI Blvd.
Douglas, Arizona  85607

in both a professional capacity and individually

Defendant#8

CO III Lomeli
Corrections / Disciplinary Officer
Arizona Dept. of Corrections
6911 N. BDI Blvd.
Douglas, Arizona  85607

in both a professional capacity and individually

Defendant #9

Corizon Health Services
950 W. Elliot Rd. Suite 220
Tempe, Arizona  85254

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.      Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

see attached counts

## III.    Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

☐     Pretrial detainee

☐     Civilly committed detainee

☐     Immigration detainee

☒     Convicted and sentenced state prisoner

☐     Convicted and sentenced federal prisoner

☒     Other *(explain)*    Released

## IV.    Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.      If the events giving rise to your claim arose outside an institution, describe where and when they arose.

B.      If the events giving rise to your claim arose in an institution, describe where and when they arose.

While in custody of the Arizona Dept. of Corrections during the course of incarceration and continuing for the duration thereof.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

    C.      What date and approximate time did the events giving rise to your claim(s) occur?

Between the dates of 3/30/2014 and 10/20/15 - dates for which grievances were filed contain more pertinent information as to the allegations made in this complaint; however, the civil rights violations to which these pertained existed for the duration of confinement.

    D.      What are the facts underlying your claim(s)? *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*

see attached counts

## V.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Suffered from deprivation (denied food) and suffered from pain inflicted by conditions of incarceration - refused proper treatment for ongoing issues. Dental health also suffered greatly; had to be attended to upon release.

## VI.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

DEMAND FOR A JURY TRIAL
Request is made to have a jury hear the allegations levied in this complaint and decide on appropriate damages in the case of...
Compensatory damages - based on the number of days of incarceration that deprevation and infliction of pain and suffering took place.
Punative damages - for the callous indifference exhibited by repeated acts of civil right violations.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**VII.   Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

A.   Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☒ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Arizona Dept. of Corrections - Alhambra (Phoenix) and 'yards' at the ASPC Douglas, Gila and Eggers

B.   Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☒ Yes

☐ No

☐ Do not know

C.   Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☒ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

Requests and complaints were filed in relation to all claims which have been filed here; in only one instance was any relief granted and that was when most of my time of incarceration had already passed. That was in relation to being recognized as a "vegetarian", however, even when such occurred I was denied access to such a diet - still denied proper food, with or without a 'diet'.

D.     Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☒ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.     If you did file a grievance:

1.     Where did you file the grievance?

At the 'immediate' level with personnel on the yard, at the complex level with the warden, and at the top administrative level with "Central Office".

2.     What did you claim in your grievance?

Grievances - re. all manner of complaints now being filed.  All of the appropriate paperwork detailing the filing of these requests and grievances has been retained and provide a complete 'track record' of this information. (a pile of paperwork that can be measured in inches.)

3.     What was the result, if any?

No relief was ever granted, save in the instance of (finally) being recognized as a vegetarian when all other avenues (levels) of the grievance process had been exhausted.  By that time, most of the duration of incarceration had already passed and DESPITE the "official" designation, deprevation of food continued as I was still denied actual access to such a diet (although the food was readily available to inmates).

4.     What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  *(Describe all efforts to appeal to the highest level of the grievance process.)*

Every step of the process available was exhausted in an effort to secure the rights stated herein.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

F.      If you did not file a grievance:

1.   If there are any reasons why you did not file a grievance, state them here:

2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

G.      Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

Have such information in the form of 'hard-copy' paperwork for every grievance filed and at what level - any or all of which can be made available in support of the claims made in this complaint.

*(Note:  You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII. Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☒ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☒ No

B.   If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s) _____

Defendant(s) _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition. _____

7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

_____

C.   Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

☐ Yes

☒ No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.    Parties to the previous lawsuit

      Plaintiff(s) _____

      Defendant(s) _____

2.    Court *(if federal court, name the district; if state court, name the county and State)*

3.    Docket or index number

4.    Name of Judge assigned to your case

5.    Approximate date of filing lawsuit

6.    Is the case still pending?

      ☐ Yes

      ☐ No

      If no, give the approximate date of disposition _____

7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        _____

| | |
|---|---|
| Signature of Plaintiff | |
| Printed Name of Plaintiff | Cary VanDerMeulen |
| Prison Identification # | 289748 |
| Prison Address | |
| | City          State          Zip Code |

### B.     For Attorneys

Date of signing:     6/29/18

| | |
|---|---|
| Signature of Attorney | |
| Printed Name of Attorney | Cary VanDerMeulen, in pro per |
| Bar Number | |
| Name of Law Firm | |
| Address | 4621 E. Villa Rita Dr. |
| | Phoenix          Arizona          85032 |
| | City          State          Zip Code |
| Telephone Number | 602-283-4646 |
| E-mail Address | cary_vdm@hotmail.com |

Cary K. VanDerMeulen
4621 E. Villa Rita
Phoenix, AZ 85032
(602) 283-4646
cary_vdm@hotmail.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## PHOENIX DIVISION

**Cary VanDerMeulen**

**V**

**STATE_OF_ARIZONA,**

**DEPARTMENT_OF_CORRECTIONS**

**Case Number**
CV 17-03828-PHX-JAT(DMF)

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

**The Arizona Department of Corrections, through their Policies, Procedures, and Administration, did cause:**

Count 1) <u>Denial of Proper and Adequate Nutrition</u> (Basic Necessities) – **undue and unnecessary deprivation; refused proper and adequate food that was readily available to inmates. Caused plaintiff to go hungry and be malnourished as a result of their actions.**

Denial of basic necessities and a deliberate indifference to the provision of such – do not eat meat for health/religious reasons; not given a proper, adequate diet when ADOC knew from day one that I would not consume meat. **Went through all administrative remedies, but was still denied food.**

The Arizona Department of Corrections through their policy has sought to deny the right to proper food and nutrition, both in keeping with the lawful standards* that have been set forth in meeting with basic nutritional requirements and in keeping with known nutritional needs of a person in their charge.

COMPLAINT - 1

*as established by the National Academy of Science and other relied upon sources (see Addendum)

It should be noted in this regard that the menu provided by ADOC does not properly reflect the food that is actually given, i.e. The menu would say cheese, but a synthetic, oil-based product is substituted that does not comply with the nutritional value normally attributed to cheese - a dairy product. By the same token, where "broccoli" was specified on the menu, broccoli stalks were more often than not served – providing but a fraction of the nutritional value of "broccoli". (This is exemplary of the 'short-cuts' taken by ADOC when it comes to providing for the inmate population.)

Additionally, no regard is given to the (changing) nutritional requirements of an aged or aging population – specifically the 50+ category who are being given the same food as much younger men who can subsist on such a regimen with no (apparent) harm... i.e. sugar-coated cereals and high-carbohydrate 'filler' products. **Effectively promoting the onset of 'old-age' diabetes and related diseases of old-age prompted by such a deleterious diet.**

A. ADOC denied medical need for a diet – stating that diets are a "religious matter" and referred requests for dietary needs to the 'Chaplain'.

1. Upon admission and almost immediately after entering ADOC, I met with a doctor (an employee of a contracted provider, Corizon Health) whom I informed that I do not eat meat. He was the first to tell me that (per ADOC), diets were a "religious" matter. I made (formal) request to see a chaplain, but received no response.

(This doctor also did nothing to see that the antibiotics that I had been prescribed and were taken from me by the Arizona Dept of Corrections upon admission got returned or replaced; see further under improper Medical.)

2. The Chaplain (Donnelly) deferred entertaining such request and subsequently retired.

3. The new Chaplain (Herman), repeatedly refused such request and [ridiculously] requested the religious grounds upon which someone should be

COMPLAINT - 2

given proper food or 'how being denied food violated the exercise of my religious freedoms'. He exhibited a callous disregard for the rights and needs of a person, knowing that they were going without proper sustenance for the period of time in which these requests were being made, did take a full thirty (30) days in which to respond in each instance. This he did THREE times over.

**This he did, despite religious references (Biblical) as to the choices we make, admonishments against judging another man's choices, or [the absurdity] of following the dictates of another man's conscience – all detailed in the grievances supplied him.**

**Note:  As stated, a record of all grievances filed and administrative remedies attempted can be supplied in support of these statements.**

4. It should be noted that no one handled such requests in the interim.  I was informed by an 'associate' chaplain that they did not have the 'ability' (per ADOC) to address requests for a 'religious' diet; only the 'head' chaplain (of which there was none) could approve such requests.  In essence, I was still being denied food, "in absentia".

B. With two exceptions, the Arizona Department of Corrections and their employees demonstrated a "deliberate indifference" to the nutritional needs of a person in their charge.

1. Through the auspices of ADW Gregory, I was 'allowed' and provided with proper meals for the brief period of time that I remained on the "Gila" yard. This was done by his stating that Alex Ruiz should put me on the dietary list until such time as 'official' approval was made for the diet.  This was rescinded by Mr. Ruiz when I was no longer on the Gila yard, having been transferred to "Eggers" (within the same Douglas complex), and I raised issue with the fact that the kitchen there (for which he is responsible) was not supplying dietary food in keeping with the approved ADOC menu.
Instead of 'policing' the kitchen of which he was in charge, Mr. Ruiz, the ADOC 'coordinator' with Trinity Food Service, chose to refuse food to an inmate. (As well as ignoring the fact that the kitchen manager at the time, "Valencia", was not complying with the mandated menu.)

COMPLAINT - 3

In fact, Mr. Ruiz denied food on two occasions – first, as outlined above and secondarily, when I was (eventually) granted a "religious" diet, specified to be "vegetarian" per administrative directive (upon administrative appeal), but was given a "vegan" regimen instead, I did request that I be given such food as was readily available (and regularly served), in keeping with the administrative order – this he refused to do.
(As with all such requests made, I have hard-copy documentation of the formal request made and the response had.)

Another potential issue is raised in this regard.  ADOC was aware or should have been aware that there was no one (at the time of my transfer) on such a diet at the "Eggers" yard and that the kitchen staff may not have been conversant in (or amenable to) providing for these dietary needs.
Yet, the transfer was administratively made, regardless.

2.  The head administrator of Religious Services at Central Office, Mr. Linderman overrode Chaplain Herman's denial(s) for a diet and issued an order that I receive a "vegetarian" diet – an order which was not complied with by his subordinates or by any other employees of ADOC.
I was in fact told by a number of them that a "vegetarian" diet at ADOC "did not exist", although the food which would comply with such a diet certainly did, was readily available, and was served to the population as a whole.

Apart from these two instances, I was denied a proper, adequate diet for the duration of my stay by all of the responsible parties involved – despite any directive that had been issued.

This would include - in addition to the named persons appearing above (Chaplain Herman and Alex Ruiz),

Charles Ryan, Director of ADOC – at the beginning of my incarceration at ASPC Douglas, received a certified letter as to the dietary needs of a person in his charge. Through his office and designated administrators, refused to provide for a proper/adequate diet.

Meegan Muse, Warden ASPC Douglas - received formal complaint regarding a person in her charge not receiving proper, adequate nutrition, as well as an administrative appeal of her decision to deny a proper and adequate diet.

COMPLAINT - 4

Despite ADOC policy and an attempt to restrict dietary approval based upon religious grounds, (multiple) requests were made to obtain a proper diet to meet with medically established needs...

**Starting with the letter\* to Charles Ryan, followed by numerous grievances and administrative appeals; ADOC and its employees knowing full well that a person in their charge was being deprived of proper and adequate nutrition for the duration of that time.**

\*My wife had sent a (certified) letter to the head administrator of ADOC, Mr. Charles Ryan, requesting that I be given a diet <u>as was medically indicated and befitting a man of my years</u>.  The response had from a member of his staff – in essence, 'Well, I hope he has money to buy food (from the commissary) because we are not going to feed him'.

(Note: I have hard-copy documentation for what I am relating here – to and including one administrative submission after another placed in an attempt to rectify the matters of which I write.)


Count 2)  <u>Improper Medical Care</u> –  **in addition to the infliction of needless pain and suffering during my stay at ADOC, requested medical attention for the condition was denied, as were other basic medical necessities.**

A.  Upon admission to ADOC, a valid prescription\* issued to a named patient (myself) was taken by the Department.  Upon seeing a doctor at the facility (Alhambra in Phoenix), the prescription was not returned, nor replaced.
A routine medical examination and interview given to all entrants at the time revealed two things:

1.  The patient was still suffering the effects of a non-specific infection for which antibiotics had been prescribed and exhibited an elevated temperature (fever), of in excess of 100 degrees.

I was allowed to (needlessly) suffer with the malady that I had contracted without the assistance of the antibiotics to help me recover, and was

COMPLAINT - 5

needlessly placed at a substantial risk of additional complications by the interruption of a course of antibiotics.

**Without question, the interruption of a course of antibiotics is not medically sound and doing so places the patient at risk.**

Note: The healthcare provider who issued the prescription* at a county facility and the doctor seen at ADOC are contracted from the same 'outsourced' supplier of medical staff used by both the county and state, Corizon Health, Inc.

2.  The patient had maintained a diet for a number of years that did not include the consumption of meat in order to preclude medical conditions as were indicated by coronary inflammation and elevated cholesterol levels. Such conditions were alleviated through diet without the necessity of resorting to the use of pharmaceuticals and suffering the complications* thereof, as would otherwise have been the case.

*One of these drugs (a statin) that the doctor would have prescribed in an attempt to 'fight the symptoms' from which I was suffering (while still on a diet that contained meat), my father had almost lost the function of his kidneys while taking; indicating the possibility of a "genetic predisposition" to such drugs. This information concerning 'physiological' history and make-up was conveyed to Ms. Kinder, the FHA at the time, **along with the medical reports substantiating a known condition and the clinical evidence (lab results) showing how the condition had been alleviated through diet.**

By this time, there is no doubt that a person in the charge of ADOC was 'officially' being denied the basic necessity of food, was lacking a proper, adequate diet, and was continuing to be denied. It was known that he would not consume meat products to his own detriment in order to avoid inducing a medical condition resultant from such consumption...

Subsequently (in relation to the suffering inflicted by the conditions of confinement, detailed in E. below), it was indicated by those in the employ of ADOC that unless a 'condition' was "life threatening", nothing would be done by ADOC to treat such a condition; that ADOC was "under no obligation" to make any provision for such.

COMPLAINT - 6

Elevated (high) blood pressure was given as an example of such a condition – while ignoring the medical implications of the increased incidence of heart-attack and stroke associated with arterial inflammation and high cholesterol; as if those didn't pose a threat to life, the quality thereof, and certainly to longevity. **The taking of a man's years in addition to those imposed by his sentence.**

B. ADOC through their administrators and contracted employees did (repeatedly) deny the provision of a proper and adequate diet, as was medically indicated.

Apart from those individuals cited in Count #1, above, the following individuals in their capacity for ADOC (as Facility Health Administrator) as well as in their professional and personal capacities, did deny such a diet.

1. Deborah Kinder, FHA– a number of communications were had with Ms. Kinder regarding the requirements for an approved diet.  Despite any medical indications to the contrary, Ms. Kinder refused to grant such approval – making both excuse based on ADOC policy and subsequently (**when provided with clinical evidence supporting such contentions – lab tests** run before and after assuming such a diet); putting forth such absurdities as, 'Well you're OK now, so there is no need for such a diet.'*, **in complete contradiction of medically established criteria.**

For that matter, in contradiction of a number of things – above and beyond the lack of common decency in denying food to a human being, ignoring one of the basic tenants of healthcare as promulgated by the Hippocratic oath, "First, to do no harm".  Harm that Ms. Kinder now advocated in her response. This, in addition to the charges of this complaint – the unlawful denial of a basic necessity by the very people (Ms. Kinder and Mr. Brunhofer) who should be the first in line to see that the needs of the inmates are met.
But then, such an immoral attitude, distain exhibited for what is descent, and what is in fact mandated by the law, comes right from the "top".
(see reference to "Attitude from the 'Top'[1])

*This statement was based in part on blood work that had been done while in custody – and the indication that levels were "normal", although NO ACTUAL RESULTS were ever obtained, despite [multiple] requests.  (see D, below)

(It should be noted that while operating in their capacity of FHA for ADOC, Ms. Kinder, as well as perhaps Mr. Brunhofer, were employees of a contracted agency, Corizon Health, Inc., hence their inclusion as a party to this action.)

2. William Brunhofer, FHA – assumed position as the health administrator for the facility and was written contesting the decision of his predecessor (as was his own). He denied a diet on the basis of ADOC policy, that diets were the providence of religious services and took no responsibility for the matter. He stated that an "allergy" would need to be claimed to substantiate a medical necessity. In other words, instead of providing for the care and well-being of an inmate, he espoused the 'rhetoric' prompted by ADOC policy, and exhibited an attitude of "patient be damned", despite his position as Healthcare Administrator for the facility.

C. The results of the medical tests that were conveyed to Ms. Kinder were never placed within the patient's medical records – indicative of not being able to receive proper health care, the records lacking such pertinent medical information.

From what I understand, prima facie evidence of a violation of civil rights in relation to medical and health care is to NOT place the medical history / records of a known condition into an inmate's medical file – reason being, "it is not possible" for them to receive the proper care if it is not documented or record made of it. The records in question were from a well-known, certified lab that various physicians send blood samples to for analysis. As a healthcare practitioner and in particular as the FHA, she should have been fully cognizant of the implications of not keeping / maintaining proper medical records (so as to provide proper medical care).

D. Specific request(s) were made for the (actual) results of the blood-work done, both verbally at the time it was administered, when I was told that the results would be 'shared' with me – a condition of my consent; and subsequently, in writing, to which request I received a single sheet of paper containing only one word, "Normal". Yet, ANOTHER request was made for the actual results, which medical request received NO RESPONSE.

COMPLAINT - 8

It should be mentioned at this point that the Arizona Dept. of Corrections through their administrators and persons in their employ have continued to violate the rights of persons in their charge – despite ADOC having made agreement with the U.S. District Court concerning the curtailment of certain activities (policies and/or procedures) giving rise to these [continuing] violations.

I am speaking specifically about the settlement reached in the case of Parsons v. Ryan which details such activities; over one-hundred of them to which the Arizona Dept. of Corrections agreed to curtail or measures to which they are to adhere in settlement of the suit.

Specifically in this case, these items relate to:

Measure #47 - A Medical Provider will communicate the results of diagnostic study to the inmate upon request and within seven calendar days of the date of request.

Measure #71 - inmates with diagnosed and documented diseases OR conditions that necessitate a special diet will be provided the diet, if <u>clinically indicated</u> (emphasis provided)

As can be seen from what is conveyed here, the conditions of the settlement were not being met by the Arizona Dept. of Corrections.  In fact, the <u>civil rights violations</u> which pertain to these two measures were committed <u>in the very same manner</u> as the enumerated measures (to which ADOC had agreed to adhere) were meant to preclude.

(Attitude from the 'Top'[1])
Through the auspices of CO IV Frisbee copies of a 16-page document outlining the state of health and medical care given at ADOC (of which I had some intimate knowledge), including specifically how the agreement to the provisions of the settlement in the case of Parsons v. Ryan were being ignored by ADOC, were distributed to Charles L. Ryan - Director of ADOC and one Mr. Richard Pratt - Interim Division Director of Health Services.

They were apparently so impressed with the details presented that nothing was heard from either of them in response, nor was ANY REMEDIAL ACTION forthcoming...

COMPLAINT - 9

In this regard (in addition to the continued Civil Rights violations that the agreement was meant to curtail), the lack of integrity exhibited by these individuals that doesn't even carry the weight of the piece of paper they signed is reprehensible. (And nothing short of a "slap-in-the-face" to the Federal Court that ratified the agreement that these men so blatantly ignore.)

*Both men were "the" signatories to the agreed settlement of Parsons v. Ryan - Further information on the distribution of the 16-page document and the case of Parsons v. Ryan has been provided in an Addendum.

E. **The infliction of substantial and continued pain during incarceration.**

I suffer from a 'bad' back – a condition resultant from auto collisions that impacted my back and neck, for which I had been under frequent and intermittent chiropractic care ever since; a condition that was exacerbated due to sleeping on a 'bunk' that was a slab of steel.  I had been issued a "medical mattress", another 'mat' that didn't supply much (more) in the way of cushioning, or 'cushion' the fact that I was lying atop a slab of steel.

Problems of discomfort and pain continued from one day to the next and despite multiple requests to be seen by a chiropractor when the pain became enough to drive one to distraction, it was continually denied.
It was at this time that I was introduced to the concept that as far as ADOC was concerned, care would only be provided for "life threatening" conditions... **incapacitation and  long-term debilitation apparently don't matter to ADOC.**

It got so bad that one morning I arose to find that ANY movement – sitting down, standing-up, attempting to walk, brought excruciating pain.  Beyond "baby steps" I was not mobile, to the point that one corrections officer asked if I needed a wheelchair.  This had been brought on by another rough night, my back being 'tweaked' and kinked to the point of bones resting upon nerves. More than a 'baby-step' and I would literally fall on my face from an inability to extend as 'shooting' pains ran up and down my legs.  I was already scheduled for a dental exam that day if I recall rightly.  So, as I was already going to the Mohave yard (on the Douglas complex) where most of or the more involved medical treatment took place, "medical" endeavored to have the nursing staff 'take a look at me'.  I was told, once again, that chiropractic

COMPLAINT - 10

treatment was not [going to be made] available, although I pretty much knew that as long as the nerves in my lower back were being impinged, I would continue to have muscle spasms and pain.  One of the nurses in particular was familiar with conditions where muscles would seize-up as she had on occasion gone to the hospital to get a shot that would relax the muscles and alleviate the seizures as well as associated pain.  However, she indicated that "I wasn't getting any of that, here."  The "best" they had to 'offer' was something referred to as an ibuprofen 'derivative', "If I wanted to try it".  Try it?  Anything to make the pain stop was motivation enough for me; not that it did a thing but leave me with a bad 'metallic' taste in my mouth.  **No proper medical care – that which was indicated by the condition being suffered was not to be had, not while in the custody of ADOC.**

F.  Lack of proper dental care – the level of care provided while incarcerated amounted to little more than an exam and [only] one 'cleaning' in a two-year period.  I had requested further care, but only received notification that I was "on a waiting list".  The condition of my oral health became so deteriorated while in custody that I was subsequently told by more than one dentist that I would have to (and did) undergo extensive 'perio' treatment before any normal 'maintenance' routine could be resumed.  Meaning that the condition of my gums had so deteriorated due to not receiving proper treatment while in the care of ADOC that I needed to have major work to come 'up to snuff'.  Work which is normally indicated for an aging population where more problems arise from gum disease than from 'cavities'.  Conditions recognized as having potentially adverse effects on the overall health of the body and organs.  **The need for this care was ignored by ADOC and I suffered as a result.**

G.  Potentially threatening exposure to otherwise unnecessary injections being administered that would not have been required **save for the negligence or treatment refused by the Arizona Dept. of Corrections**.

1.  A "tetanus" shot was needed after being injured due to ADOC neglecting to correct a dangerous situation (of which they were apprised); however, what I received was a DPT shot.

2.  Proper medical attention was needed for back 'seizure'; was given a 'shot' of an "ibuprofen derivative" instead.  Not only 'improper'

treatment for the given condition (proper treatment being refused by ADOC and the action taken not being remedial), but ibuprofen drugs have been positively correlated to increased incidence of heart-attacks and strokes. Information that was <u>not given or made available</u> (prior to administration of the drug).

H.  Medical care is so severely lacking that, **"I couldn't get as much as a "Pepto-Bismol" for intestinal problems brought on by bad food."** (perhaps bad preparation or handling)

How about some Kaopectate or Immodium?  "NOPE" (short for, "no es posible")

REALLY!  How is it that one of the most basic of healthcare remedies that could found in almost any 'medicine' cabinet in any home in America isn't provided for an entire prison population?

Note: As to the conditions where even the most fundamental of remedies could not be had, the contracted healthcare provider (Corizon Health) and/or its employees need to take responsibility for the role they play.

Count 3) <u>Exercise of First Amendment Rights</u>

As can be seen from these complaints, there is some 'overlap' as to the counts alleged and the laws to which the violations pertain. The same is true here...

A.  Failure to recognize an expression of a religious freedom – denial of food

If I had been Jewish, I would have been fed.  If I had been Moslem, I would have been fed.  But, as a Christian, I am denied the "right" to food.

Chaplain Herman had the audacity* to question the exercise of a religious belief as a (necessary) basis for the feeding a man; beliefs which were exemplified by many months of doing without [the basic necessity of] proper sustenance while ADOC continued to deny me.
As was explained to him (in writing, in religious terms) that when knows better, one does not do things to their own detriment (or anyone else's) as a matter of principle.  He was told (in writing) that I do not (any longer) smoke

COMPLAINT - 12

or drink by virtue of these reasons; nor, by that same reasoning, do I eat food which makes me 'sick'.

*Someone versed in scripture does not question or contest the dictates of another man's conscience in the exercise of their religious beliefs, as is admonished in scripture.  Chaplain Herman was provided with these scriptural references which had no sway on his continued refusal(s) to make provision for food.  And, while refusal of a basic necessity may be entailed under the fourteenth amendment, <u>basing such a refusal upon "religious" grounds</u> (as supposedly dictated by ADOC "policy" regarding diets) and Chaplain Herman's pejorative attitude in the matter, <u>impinges upon the exercise of a religious freedom as to what one puts in one's own body</u>.

Chaplain Herman failed to respond or answer the inquiries put to him in our correspondence concerning the unsubstantiated assertions he made that were given as 'reasons' for denying a man food.

As to the matter of "firmly held" beliefs, abstaining from food that one would consume to one's own detriment over the course of many months pretty much says it all – anything less belies the fundamental tenants of religious belief; that in the same manner as one does not hurt others, one does not hurt oneself.

B.  Denial of religiously related writings and an attempt to preclude such based upon an "approved publishers list", or as being from a particular source, without correlation to any penological interest.

A newly published (unused, not previously owned) and difficult to find copy of a book was sent to me (directly from the distributor) that had been purchased on Amazon. Due to the book being termed "third-party" by ADOC, they would not allow me to have the book due to its 'source' (Amazon Marketplace). Indeed, such a book was contained in the library at the Gila Yard and it was even stated by (the employees of) ADOC to whom grievances and appeals were submitted, that there was "nothing wrong with the book", but that it was 'due to ADOC policy' that I could not have it while confined in their facility.

Because of the limited availability of the publication, to 'ban' such on the basis of the distributor from whom it is purchased is tantamount to banning it

COMPLAINT - 13

altogether – just as food is sustenance to the body, such materials are food for the 'soul'; can there be any greater deprivation?

Is this not why the courts have stood firm on the right of access to published materials?  Anything less would provide only for the preservation of the body, while allowing the man himself to wither.

Count 4) <u>Lack of Access to the Court</u>

A.  The resources to which I was limited in researching the legality of the wrongs done during the course of my stay in the Arizona Department of Corrections amounted to the writings of Prof. Michael Mushlin in his multi-volume work on the "Rights of Prisoners", along with a manual pertaining to the (administrative) "orders" of the Arizona Dept. of Corrections, and a Black's Law Dictionary...

This in and of itself represents a lack of access to the court which prevailed during my stay – per Prof. Mushlin, at a minimum, a library containing certain volumes and references are needed to substantiate an effort on the part to the institution in attempting to comply with that right of access; something that was definitely remiss.

B.  Insufficient reference materials, no internet, no access to the court.

No 'modern' means of accessing the court or the ability to research laws, legal procedures or principles were provided – no online access whatsoever.

Nor for that matter, the use of 'modern' methods to produce legal documents (as an alternative to online, electronic submittal) – computers with word processing capabilities were available, but the use of such was denied, despite formal request being made specifically for legal purposes...

(Not as much as an old typewriter and the use of some "Wite-Out".)

C.  Materials necessary to pursue legal matters were not provided.

This all necessitated the use of 'old-fashioned' pen and paper – a pencil to be precise, in order to make corrections.  Little or no provision was made for this, there being only one occasion in which such a provision was made, initially upon my incarceration when I was termed "indigent" as no money had ever been placed on my 'books'.  Once this occurred (whether there was  money in

the account or not), I was deemed no longer 'qualified' to receive such materials – no money, no materials, no access to the court.

D.  The manual procedures outlined above (vs. electronic submittal) necessitate the production of copies as required by the court, lots of them; the sheer volume of which makes it a practical impossibility to reproduce court submittals by hand.
Copies must be had from ADOC to make these submittals possible, but two problems are posed in this regard.

1.  The charges imposed by ADOC for the production of (legal) copies are over and above the actual cost of production.  When one is paid as little as twenty-five cents an hour and the charge for a copy is ten cents a page (vs. actual production cost), the charges to reproduce legal documents is exorbitant.

2.  While ADOC will not refuse to make legal copies, an accounting is kept of the charges incurred.  Once any money appears on the 'books' it is immediately applied to any outstanding charges, regardless of any money it might leave.  This literally takes the food out one's mouth. (Particularly when the word from Central Office was essentially, 'Well, I hope you have money, because we are not going to feed you.') And ADOC is profiting from the charges collected in the mean time. (Questions of this nature are raised in the Addendum.)

As an aside, once the pencil sharpener in the "library" broke and was not replaced, the ability to even sharpen a pencil was eliminated, at least as far as being provided by the ADOC.  (And yes, it was brought to their attention.) I know this might seem 'nit-picky', but it is just indicative of the conditions which exist within the Dept. of Corrections that seem to make it [impossibly] difficult to access the court; not the least of which is,

E.  Lacking the resources or access to resources (as outlined above) that would provide the knowledge or ability meet with the requirements of access to the court; the principles, procedures, and forms (or format) necessitated, ADOC provides for the assistance of a 'paralegal'.  Or, so they say… Multiple requests had to be made for such assistance, as initial request went unanswered (unacceptable even by ADOC standards) and request had to be

COMPLAINT - 15

made again.  Once contacted by the paralegal, the information provided was of little use as the <u>forms promised and the assistance offered never materialized</u>.

Count 5) **Punitive action taken by ADOC in retaliation for pursuit of a "protected right"** (the right to a basic necessity)

I took the same tray of food offered to all inmates and was punished with additional time of incarceration (a LIBERTY CONDITION) for accepting a tray of food WHICH COULD NOT RIGHTFULLY BE DENIED.

This was despite the fact the tray of food was in compliance with the directive from Central Office that I be given a "vegetarian" diet.  Due to it not being 'vegan', the diet I was "placed on" (as supposedly, a "vegetarian diet didn't exist"), the Department took the position that I had "disobeyed an order, either written or verbal" and was I so charged with a "major" violation.
At least that is what was purported by the parties involved.

This was all contrived by ADOC contrary to the facts of the matter:

1) The food to comply with a "vegetarian" diet was readily available and was served to the inmate population as a whole – with the exception of the meat products served which could readily be supplemented with the food served to 'vegans'; yet I was denied the basic nutrition of food that was served to the population as a whole that would primarily comprise a protein constituent of a vegetarian diet – eggs and milk (dairy products)

2) The directive from Central Office specifically stated that I was to receive a "vegetarian" diet – a diet I did not receive, in contradiction of the order issued by a 'superior' authority within the ADOC structure than the personnel that refused to comply with such an order… i.e. Chaplain Herman's decision had been overridden by Central Office, yet Chaplain Herman did not comply with that order; nor, for that matter, did anyone else in a position subordinate to the Administration of Central Office.

3) There was no other order issued concerning my diet; only an "agreement" which by its very verbiage, did not constitute an order (in fact, it was not in compliance with an order that was issued).

COMPLAINT - 16

The 'agreement' itself by its wording dictated the terms and conditions for such a diet and the repercussions if it was not followed (that did not include any "disciplinary" action).

What ensued was a complete "kangaroo court" headed by a Captain that I'd not previously met, Capt. Paul Martell. He developed an attitude because I had something to say about it, was willing to stand my ground and represent myself as to the facts of the matter – there never was any order given (written or otherwise) that had been violated. (No order, no possibility.)

I showed him the dietary 'agreement' that had been presented me by Chaplain Herman. Nowhere was there to be found any verbiage concerning an "order", or anything of that nature. At most, it stated that a diet could be 'pulled' for a period of six months if it was not adhered to; it made no indication of any 'disciplinary action'. That, despite the fact that I had a document from Central Office that stated I was to be recognized as being a vegetarian (not a vegan), and that the tray of food, the same as offered every other inmate, conformed to a vegetarian diet. A document that Capt. Martell <u>refused to look at</u>... that and several pages of writing I had done the prior evening in support of my 'case'. This he shoved aside and <u>refused to view</u>. At the conclusion of the 'disciplinary hearing' when I reiterated that there was never any order given to violate, he got belligerent and told me to "gather my papers and get out". I said "OK, give me a minute" as I gathered-up the papers he had 'strewn' across the desk (as opposed to looking at). He responded with, "Take this crap off my desk, right now". "And, that's an order."

During the course of the "interrogation" the only infraction that could be determined to have been was committed was by the Captain himself.

He violated ADOC policy* in not providing for a fair, impartial hearing, allowing a chance to present 'my side of the story' as was documented. That, and the tenants of any actual 'hearing' that is conducted – the right of the accused to answer the charges and present evidence in their defense.

*Department Order 803 – the right to present evidence both *verbal and written*. (*emphasis provided*)

In these activities, Capt. Martell was "aided and abetted"* by one CO III Lomeli, about whom I did document inappropriate activities on her part that comprised the production of falsified documents and the rendering of false statements. Due to the very incendiary nature of its contents it was only

COMPLAINT - 17

reviewed (viewed) by a security officer and retained (under advisement) for future reference... filing of these charges against CO III Lomeli while still residing on the yard may have led to other reprisals on the part of a person or person(s) who had already proven themselves to be unscrupulous in their actions.
(*If not instigated by her as the "Disciplinary Officer" on the yard who brought the false charges.)

This was an issue of major import as the 'result' of the "hearing" was the imposition of time being 'added' my sentence, or additional time of incarceration by refusing to recognize "good time" that had been accumulated. I received paperwork from ADOC subsequently, stating that I had been found "guilty" of disobeying a direct order by security personnel and the imposition of the additional time... (Yes, I did dispute this and have the paper 'trail'.) Before I left ADOC, I also received more paperwork extending my stay even further with no rhyme or reason for it. I went to a CO III concerning the issue and put in paperwork requesting an explanation as to the "time calculation", but never received an answer prior to discharge. All of which, from my understanding, represents a "liberty interest" in relation to my incarceration. **Rights that were violated at the whim of ADOC and its representatives; including Capt. Martell and CO III Lomeli.**

As to all of these matters, the civil violations by the Arizona Department of Corrections and by the people working on its behalf, it is sometimes difficult to discern or make a distinction concerning the actions of the persons involved in the deprivation of rights as to their acting in an official capacity when following a policy of the institution, or as to their personal responsibility in causing such deprivation. This is particularly true when the person involved is an administrator who has a hand in the formulation of such policies as opposed to their execution.
Personal responsibility in this regard is evident when such policies have already been challenged in court, yet violations continue in the same vein, regardless of any remedial action. Additionally, if such policies are in violation of constitutionally guaranteed rights, they are not lawfully enforceable and a claim that one was merely "following orders" does not provide an excuse for wrong-doing or operate as a means of personal indemnification.

COMPLAINT - 18

When the person involved operates in a manner contrary to 'official' policy, the person involved clearly assumes a personal liability in this regard.

To clarify, I wish to pursue complaint against the Arizona Department of Corrections and persons in their employ BOTH as to their official capacity and as to their personal involvement and liability.

Dated this 29th day of June, 2018

Cary K. VanDerMeulen, In Pro Per

COMPLAINT - 19

| | |
|---|---|
| **Cary VanDerMeulen** | **Case Number**<br>CV 17-03828-PHX-JAT(DMF) |
| **V** | |
| **STATE_OF_ARIZONA,** | **CIVIL RIGHTS COMPLAINT** |
| **DEPARTMENT_OF_CORRECTIONS** | |

<u>Addendum</u>

*Due to these factors, I am relatively sure that the minimum federal standards established for the feeding of an inmate population have not been met by ADOC.  This affects a whole lot more men (and women in similar institutions) than just those with various dietary 'restrictions'.  It effects the entire population of these institutions for the duration of their stay... a little more significant in the 'scheme' of things than just the denial of food to particular inmates.

Note: All of these violations are supported by laws and case citations as presented in "The Rights of Prisoners" by Professor Michael B. Mushlin.

As mentioned, I have written and recorded documentation as to all of these violations as well as documentation showing that administrative remedy was pursued (and in most cases exhausted) during the time of my incarceration.

*"The degree of civilization in a society can be judged by entering its prisons."*

-Dostoevski

I seriously doubt that any man could read the contents of this complaint and not have their ire raised...

<u>The 'Racket' of Providing for the Inmate Population</u> – an issue that may well be deserving of some thought, and if violations of law be the case here, the activity is certainly organized.

The services which are contracted for by the ADOC are given to 'select' companies, the particulars of their patronage, ownership and relation to the

CIVIL RIGHTS COMPLAINT - 1

Department would certainly be in question, given that fact that any food or service provided costs over and above that which could be found "in an open market".  The cost of items from the commissary are quite often higher than would could be found at your local "convenience store" which we all know carries a 'premium' for convenience, over and above those same items available at the market.

And, from what I understand, these prices are 'regulated' by the ADOC and 'allowed' to be increased in cost only so much per year (a percentage of the already over-priced list).

The cost of phone calls (outgoing only, if one has the "privilege") are *astronomical* on a per minute basis as compared to what the rest of the world pays for communication costs.

The food service, an outside contractor given the responsibility of meeting ADOC guidelines (as well as those mandated federally) for the feeding of an inmate population.

The medical services provided, an outside contractor.

All of these 'vendors' are given 'exclusives' by the ADOC and when there are violations of federal laws and guidelines, they certainly play a part in the scenario.  But, the one thing that they all have in common – they are under the control of the ADOC whose ultimate responsibility is to see that federal laws and guidelines are in compliance.  It is the ADOC whose actions (apparently habitually and by their own dictates) are in violation of these laws and guidelines, including civil rights violations as outlined in this suit.

Along these lines, I think mention should be made of the imposition this causes and adverse impact upon the people who have 'done nothing wrong' but yet, are paying the price for incarceration – that of their loved ones.

It is usually the families and 'significant others' who pay that price (quite literally) for the questionable construct of the costs being imposed by ADOC for these items.  The "privilege" of any human contact outside the confines of prison and the "luxury" of obtaining anything other than the (sub-standard) food provided...

Or, in this case, that which was NOT provided – not even the bare minimum of sustenance required to maintain the human body in a normal, healthfully functioning condition.  To wit, my wife at the time paid this price – was so concerned about the deprivations that I was suffering, she did go without proper food herself in order to see that I had any descent amount of food to

CIVIL RIGHTS COMPLAINT - 2

eat (at the inflated prices imposed).  I learned later how great her suffering due to the actions of ADOC – that of her Thanksgiving without me; she was left with so little money after making provision for others (myself and our four-legged 'adopted' family'), that she had but a peanut butter sandwich to eat that holiday.

Was there damage done here?  You 'betcha' – unmitigated at that, and for this, the Department and the parties responsible are not forgiven.


The Case of Mr. Ruiz – the serving of 'tainted' food at ADOC

Mr. Ruiz – a particularly corrupt individual, who, as "coordinator" between the food service and ADOC he was responsible for the serving of 'tainted' food to the men.  Through his actions which were serving only to himself and his position, being much to the detriment of the men who he was responsible to 'feed', did promote the serving of 'tainted' food to the men.  Instead of removing or replacing the tainted item, he sat in front of us and attempted to lie to us about the food's condition; a condition we were all well aware of, despite any declarations to the contrary, since we were the ones to whom the food was being served.

Before leaving the Department of Corrections, I had amassed a petition of over fifty signatures protesting the condition of this particular food item, on a yard of a couple hundred men, most of whom were off the yard working at the time. This was presented to DW Langham, much to his consternation I'm sure, as he had previously announced to the men as a whole (at least those available during the course of the day), that he never wanted to see one of those "group complaints".

Unfortunately (or fortunately, as the case may be) I was not there to witness the outcome; I took my leave as I was told I could go.

Along these lines, I ran across something during my stay that may be of some significance.  It was something I came across in one of the 'dorms' in which I resided on the Gila yard.  The dorms had large 'community' waste receptacles located at various places within the dorm, or around the facility.  Large, multi-gallon garbage cans is what they were.  Plastic in construction and usually dark green in color.  One of these in particular caught my attention one day as unlike most of the others, it had large white letters imprinted on it which said,

CIVIL RIGHTS COMPLAINT - 3

"USDA Condemned".  That really got me thinking about why such a container would be there, or just how it might have come to be there (at ADOC).
I really don't think that the USDA has an 'excess' of such containers that they are distributing them (sans contents) to various other governmental organizations; which leads to only one other consideration...
(That ADOC may well have obtained 'tainted' food to be served to the inmate population.)

Parsons v. Ryan CV12-00601-PHX-DKD

The case of Parsons v. Ryan was in progress at the time that I was 'in the throes of it' with ADOC in relation to particular items pertinent to this case.
As I recall, input was being sought at the time concerning the 'conditions' of the settlement and information as to this was posted around the ASPC.
I availed myself of the opportunity to be of some assistance in the matter as I did have an intimate knowledge of the state of health and medical care given at ADOC.
A sixteen page letter (16 pages – handwritten, double-spaced) was produced outlining the same and was distributed as follows:

1)  Through CO IV Frisbee copies were distributed to Charles L. Ryan - Director of ADOC and one Mr. Richard Pratt - Interim Division Director of Health Services.

2)  A copy to the Clerk of the U.S. District Court, presumably to be made available to the judge in the case.  (should be on file – sent 1/21/15)

3)  A copy to each of the law firms instrumental in bringing the class action suit, the ACLU National Prison Project and the Prison Law Office

As to any response had, one "form letter" received from the Prison Law Office concerning submissions.

Apparently, Mr. Charles Ryan (and Mr. Pratt) were not 'phased' by being informed that ADOC was still in violation of some the very same issues that were raised in Parsons v. Ryan, despite the fact that agreement had been made by ADOC to implement measures to prevent continued rights violations.

CIVIL RIGHTS COMPLAINT - 4

No response was had from either Mr. Ryan or Mr. Pratt, nor were there any remedial actions taken.

If my understanding is correct, Mr. Charles Ryan cannot (normally) be sued personally, but is sued professionally in his official capacity as the Director of ADOC.
However, if I'm also not mistaken, this "professional immunity" from wrong-doing only extends so far... if the party in question is or has known to be in violation and continues said activity in contradiction to any remedial action that the court has already imposed, they no longer have the protection of their position as a public official.
Mr. Charles Ryan is not deserving of any such protection.  To have civil rights violations and to continue with such violations in the same vein is not at all acceptable.

By the same token, the individuals named in this complaint who have 'stepped outside' of the regulated conduct as dictated by the institution for which they work must assume personal liability for the damage they have done.

ADOC and these individuals have shown a blatant disregard of the rights of prisoners and a deliberate indifference to their health and well-being. Continued civil rights violations, and specifically ignoring the provisions of Parsons v. Ryan make the attitude quite clear; potentially exacerbating the condition of indifference beyond being 'deliberate'; calloused would be more likely (and 'depraved' remains a possibility).

I am of the opinion that unless legal remedy and punitive action is sought, ADOC and the individuals responsible for rights violations will continue to have no compunction when it comes to the treatment of people in their charge in a less than human manner.

CIVIL RIGHTS COMPLAINT - 5